## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**UNITED STATES OF AMERICA,**

              Plaintiff,

       v.

**DEMPSEY ANTONIO BROWN and
BRANDON GULLEDGE, a/k/a
MARCUS DWAYNE EDWARDS,**

              Defendants.

Criminal No. 04-457 (MJD/JGL)

**REPORT AND
RECOMMENDATION**

---

### APPEARANCES

Elizabeth Peterson, Esq., Assistant United States Attorney, for Plaintiff United
States of America

Joseph Kaminsky, Esq., for Defendant Dempsey Antonio Brown

Gary Bryant-Wolf, Esq., for Defendant Brandon Gulledge

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

       The above-entitled matter came on for hearing before the

undersigned Chief Magistrate Judge of District Court on March 31, 2005.  The

case has been referred to the undersigned for resolution of pretrial matters

pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.

       An Indictment was filed against Defendants on December 7, 2004,

charging them with the following offenses: Count I -conspiracy to distribute

and to possess with intent to distribute approximately 160 grams of a mixture containing cocaine base ("crack"), in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A); Count II - aiding and abetting possession with intent to distribute approximately 160 grams of a mixture containing cocaine base ("crack"), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.  This Court held a pretrial motion hearing on March 31, 2005 at which Defendants were present and represented by counsel.

Defendants' dispositive pretrial motions will be addressed in this Report and Recommendation.  Defendants' nondispositive motions will be addressed in a separate Order.

## I.    The Hearing Testimony and Exhibits

At the March 31, 2005, hearing, Plaintiff called two witnesses, Minneapolis Police Officers Michael Geere and James Burns.  Both Defendants also testified.  The Government and Defendants both entered into evidence photographs of the green Chevy Tahoe vehicle in question, and Defendants entered into evidence a videotape of the traffic stop which was taken from the police squad car during the stop in question.

Officers Geere and Burns testified that they have been police officers for more than ten years.  Officer Geere has received particularized training regarding narcotics and regarding effecting traffic stops and arrests.

Officer Burns testified that he has had on-the-job training in narcotics investigations.  On October 4, 2005, both officers were working together in the same squad car.  They testified that at approximately 4:40 p.m., they were traveling southbound on Knox Avenue North when they observed a green Chevy Tahoe fail to signal a right-hand turn onto 26th.  The officers entered the Tahoe's license plate numbers into their mobile data terminal to run a check on the vehicle and its registered owner.

While the check was being run, the officers followed the Tahoe, which began traveling northwest on Broadway.  The officers testified that another car pulled between the Tahoe and the squad, but when the Tahoe turned onto 29th, the intervening car was no longer between the squad and the Tahoe.  The license check information came back, and the officers turned on the squad lights, which activated the squad car's videorecorder to begin taping after a 3 to 4 second delay.  Officer Geere and Burns testified that, when they turned on the squad lights, they could see the Tahoe's passenger lean toward the console area of the Tahoe.  Officer Geere testified that the back windows of the Tahoe were tinted, but the window was backlit by the sun so he could see through them.  Government Exhibit 1 is a photograph of the Tahoe taken shortly after the stop, showing the view through the rear windows of the Tahoe.  Officer Geere testified that the passenger's actions were a "flag"

to him in his training and experience, as it suggests that a person is "reaching for something or trying to hide something." Hearing Transcript at p. 9. Officer Geere testified that in his experience and training, he has recovered "numerous guns from center consoles and from under seats where people are leaning. Like right when you make the stop, they are going to dump whatever they have or pick up something to try to assault you." Hearing Transcript at p. 9. The officers acknowledge that they could not see his arms or his hands when he was leaning.

The Defendants testified to a different version of how the two vehicles met up. Defendants Gulledge and Brown testified that they were traveling southbound on Knox Avenue North, when they passed by the squad car which was traveling northbound on Knox Avenue North. Defendant Brown testified that the officer driving, Officer Geere, looked up into the Tahoe and then turned a U-turn in the middle of the street to follow directly behind the Tahoe. Defendant Brown testified that no car ever came between the Tahoe and the squad car, and that the squad followed them for some blocks before pulling them over. Defendant Brown testified that the officers could not have followed behind them as they testified - "he didn't get behind us until almost a block, two blocks from 26th and there's a whole block. Which way did he come from? Evidently it's a one-way. There's a curve around there. He had to

– I mean, he would have been already behind us from then, from that point."[1]
Hearing Transcript at p. 118.  Defendants testified that they knew the police squad was behind them at Knox and 26th.  Defendant Brown testified that he stopped at Knox and 26th and signaled his right-hand turn.  Defendant Gulledge testified that he did not lean over the console and that the officers were lying under oath.

The officers and Defendants testified that the Tahoe was stopped at approximately 29th and Vincent.  When the Tahoe stopped, Officer Geere approached the driver's side.  Officer Geere testified that he recognized the driver, Defendant Brown, as a person he stopped recently for failure to have insurance, and that Defendant Brown had not brought in proof of insurance into the precinct as required.  Officer Geere testified that he did not talk to Defendant Brown about his failure to signal a turn because he had developed a rapport with Defendant Brown and they both began discussing the insurance matter first.  Officer Geere asked for his ID, and Defendant Brown gave it to him, along with some insurance information.

While Officer Geere and Defendant Brown were speaking, Officer Burns approached the passenger side of the Tahoe and began speaking with

---

[1]       The map of the area, as published on Mapquest.com, does not show Knox Avenue North as a one-way street.

Defendant Gulledge.  Officer Burns testified that he observed that Defendant

Gulledge did not have anything in his hands that would explain why he was

reaching, such as a driver's license, ID or wallet.  Officer Burns testified that

he asked Defendant Gulledge his last name, and Gulledge responded first by

repeating the question, "My last name? Edwards."  Officer Burns asked for his

first name, and Gulledge stated "My first name? Marcus."  Defendant Gulledge

responded the same way when asked for his middle name - "My middle name?

Dwayne."  Officer Burns testified that his training and experience, along with

Gulledge's way of responding to simple questions, caused him to believe that

Defendant Gulledge was trying to think of an answer and create a fictitious

name.

Officer Burns testified that he saw Defendant Gulledge's hands

shaking, so Officer Burns asked Gulledge why he was so nervous.  Defendant

Gulledge stated that he did not have any identification on him.  Officer Burns

testified that Defendant Gulledge's behavior  was making him nervous and

concerned for his safety, and he was concerned that Defendant Gulledge may

have either armed himself or discarded a weapon or a handgun inside the

vehicle where he was reaching when the Tahoe was pulled over.

Officer Burns asked Defendant Gulledge to step from the vehicle.

Gulledge did so, and Officer Burns performed a pat frisk for his safety. Officer

Burns testified that Gulledge's body was very tense, and his arms and legs were all flexed.  Officer Burns testified that it appeared to him, based on his experience "being in countless fights with people and, you know, reading people's behaviors", that Defendant Gulledge may attempt to flee or break loose and fight with him.  Officer Geere also came back to assist Officer Burns, who tried to speak loudly to let Officer Geere know what was going on.  Officer Geere assisted Officer Burns in the pat search by holding Defendant Gulledge's wrist, and Officer Geere testified that Gulledge's muscles were tensed up, and Officer Geere thought he was going to fight.  Officer Burns informed Officer Geere that he believed there was a gun in the console of the car, based on Defendant Gulledge's nervous behaviors and his earlier reach toward the console.  The officers placed Defendant Gulledge in the back of the squad car and went back to the driver, Defendant Brown.

Defendant Brown was asked to step out of the Tahoe.  He did so, and the officers began escorting him to the squad car.  Defendant Brown made a slight turn or movement like he wanted to get back to the Tahoe, but then he and the officers continued moving toward the squad, where a pat frisk was conducted and he was place in the rear of the car with Defendant Gulledge.  Defendant Brown testified that he turned back to the Tahoe in order to get his identification and insurance card.  Officer Geere testified that

Defendant Brown's turn concerned him greatly, and that it was a "red flag that something was in the car that he did not want us to see." Officer Geere testified "I don't know if he was going back for the gun or if there was any kind of weapon in there." The officers placed Defendant Brown in the back of the squad car with Defendant Gulledge. Officer Burns turned the squad video camera on the Defendants to record their actions and conversation.

Officer Geere began searching the Tahoe between the front passenger seat and the console, where he testified that it is typical for people to drop something immediately. He found nothing. Officer Burns looked in the center console. The console liner had been previously removed, and Officer Burns found an open bag which contained a digital scale and a large quantity of suspected cocaine. Officer Burns testified that he went back to check the vehicle for a weapon, because he had felt that Defendant possibly dropped a weapon there.

The videotape of the Defendants in the back of the squad car shows Defendant Brown mentioning to Defendant Gulledge that Defendant Gulledge had been acting "all nervous and shit." Defendant Gulledge says something about his hands shaking. At the hearing, Defendant Gulledge denied that he acted nervous or that his hands were shaking; Defendant

Gulledge testified that, on the videotape, he was referring to the fact that Officer Burns had said his hands were shaking.

**II.**   **Motions to Suppress Statements, Admissions and Answers and Motions to Suppress Evidence Obtained by Search and Seizure**

Defendants move to suppress evidence seized and statements made by them in the back of the squad car, on the grounds that such evidence and statements are products of the unlawful stop and seizure of Defendants.  The Court will address these motions by addressing each stage of the officers' interactions with Defendants: the stop, the investigative detention, the protective searches, and the Defendants' statements.

**A.**   **The Stop**

An investigatory stop allows an officer to briefly detain a suspicion that "criminal activity may be afoot."  Terry v. Ohio, 392 U.S. 1, 21-22 (1968). Courts look at the totality of the circumstances to determine whether an officer possessed a "particularized and objective basis" for suspecting such criminal activity.  United States v. Arvizu, 534 U.S. 266, 273 (2002).  In forming a basis for suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them."  Id.  "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls

considerably short of satisfying a preponderance of the evidence standard."

Id.

"It is well established that a traffic violation - however minor - creates probable cause to stop the driver of a vehicle."  United States v. Barry, 98 F.3d 373, 376 (8th Cir. 1996), quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993).  However, when police have no probable cause to stop a vehicle for a traffic violation, "a purely investigative stop must be based upon at least a reasonable suspicion 'that either the automobile or its occupants are subject to seizure under the applicable criminal laws.'" United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 646 (8th Cir. 1999), quoting Delaware v. Prouse, 440 U.S. 648, 655 (1979).  If a traffic stop is valid, it may not be challenged on the ground that it was a pretext for other investigation. $404,905.00 in U.S. Currency, 182 F.3d at 646.

The Government contends that the police officers made a valid traffic stop of the Defendants on the basis of the Tahoe's failure to signal a turn several blocks back.  Both police officers testified consistently that they witnessed the Tahoe fail to make a right-hand turn onto 26th from Knox.  The officers both explain that it took some time for the license check to run on

their antiquated squad terminal, which is why there was a several block delay

before they pulled Defendants over.  Both Defendants, however, consistently

testified that the officers met them head-on, and turned a U-turn upon seeing

them, in order to follow directly behind Defendants.  Defendant Brown denies

failing to make a right-hand turn, claiming that he was well aware of the

officers' presence behind him.

        The discrepancy between the officers' and the Defendants' stories

is troubling to this Court in light of the officers' failure to make any reference

during the stop to any traffic violation.  If the stop was in fact valid for failure

to signal, one would expect the officers to mention it to the violator.  However,

in this case, the videotape shows and Officer Geere admits that he did not

follow his routine procedure in this case of mentioning the traffic violation.

Specifically, Officer Geere testified, "When I approach the car, what I do with

everybody, it's routine procedure for me to tell the person why I pulled them

over.  But since it was Mr. Brown and we had a rapport, I brought up the

insurance and he brought it up, too, right away we just started discussing it."

Hearing Transcript at p. 15.  Review of the videotape shows that Mr. Brown

immediately produced the insurance information and valid driver's

identification.  Officer Geere spends some time talking with Defendant Brown even after acknowledging the sufficiency of the documentation; it does not appear that exigent circumstances prevented Officer Geere from telling Defendant Brown why he was being stopped.

Defendants emphasize that Officer Geere knew Defendant Brown from his prior meeting with him when Defendant Brown did not have insurance.  In Defendants' version of what happened prior to the stop, the squad car was driving toward Defendants' car when Officer Geere looked up at Defendant Brown.  Officer Geere testified that he recognized Defendant Brown as someone he had pulled over for failure to have insurance and that he thought Defendant Brown had not come into the precinct to show proof of insurance.  In the videotape of the stop, Officer Geere begins the stop with a discussion of the insurance issue.  Based on the evidence before the Court, it appears that even if Defendants' version of the events is correct, the officers still had a reasonable, articulable suspicion that Defendant Brown was driving a vehicle without insurance, which would support a lawful traffic stop. Accordingly, even if this Court were to find that the officers' stated reason for the stop - failure to signal - was not supported by the evidence, this Court is

unable to find that the traffic stop was invalid.  Accordingly, this Court cannot recommend that evidence be suppressed on this basis.

### B.     The Investigative Detention

After making a valid traffic stop, a resulting detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."  <u>United States v. Cummins</u>, 920 F.2d 498, 502 (8th Cir. 1990), quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968).  During a lawful traffic stop, police may order both the driver and the passengers out of the vehicle without further suspicion.  See, <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 (1977); <u>Maryland v. Wilson</u>, 519 U.S. 408, 410 (1997).  A police officer may detain the motorist while the making routine inquiries such as requesting identification of vehicle's occupants, asking for vehicle's destination and purpose of the trip, and conducting warrant checks.  <u>See</u>, <u>e.g.</u>, <u>United States v. White</u>, 42 F.3d 457, 459 (8th Cir. 1994); <u>United States v. Dawdy</u>, 46 F.3d 1427, 1430 (8th Cir. 1995); <u>United States v. Ramos</u>, 42 F.3d 1160, 1163 (8th Cir. 1994).  An officer may undertake questioning of the vehicle's occupants to verify information provided by the driver.  <u>United States v. Linkous</u>, 285 F.3d 716, 719 (8th Cir. 2002).  Once the purpose of the initial traffic stop is

completed, an officer may not further detain the vehicle or its occupants

"unless something that occurred during the traffic stop generated the

necessary reasonable suspicion to justify a further detention." See, United

States v. Beck, 140 F.3d 1129, 1134-35 (8th Cir. 1998), citing United States v.

Mesa, 62 F.3d 159, 162 (6th Cir. 1995).

Defendants argue that the officers extended the detention beyond

the scope of the reason for the stop - the failure to signal a turn.  The analysis

here is complicated by the fact that the officers never initiated an investigation

into the claimed reason for the stop.  Instead, Officer Geere began an

investigation of whether Defendant Brown had insurance - an offense for

which Officer Geere had a reasonable suspicion to justify detention.  During

Officer Geere's questioning, Officer Burns asked routine questions of

Defendant Gulledge and removed him from the vehicle, as permitted under

the law.  Further detention and investigation took place as a result of the

officers' protective searches, discussed below.  The actions of the officers and

Defendants overlapped, and there was no clear point at which the

investigation into the reason for the stop was finished.  Accordingly, it appears

that the Defendants' detention was reasonable under the law, and this Court cannot recommend suppression on this basis.

### C.   The Search of Defendants and the Car

During a traffic stop, officers may check for weapons and take any steps "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. Hensley, 469 U.S. 221, 235 (1985).  It is well-settled that an officer may conduct a protective search for weapons "if he or she has merely an articulable suspicion a suspect is armed and dangerous." United States v. Rowland, 341 F.3d 774, 783 (8th Cir. 2003) citing Terry v. Ohio, 392 U.S. 1, 24 (1968).  An officer's ability to conduct a protective search has been extended to allow an officer to conduct a search of a vehicle's interior, limited to those areas in which a weapon may be placed, even after un-arrested occupants have been removed from the vehicle. Rowland, 341 F.3d at 783, citing Michigan v. Long, 463 U.S. 1032, 1049-52 (1983).

In the present case, Defendants argue that the protective searches of them and the Tahoe were unconstitutional, as the officers could not have an articulable suspicion that the Defendants were armed and dangerous.  This

Court acknowledges that these facts represent a close case.  The videotape

shows the Defendants cooperating with the officers during the stop, and the

claimed purpose of the stop - a failure to signal - is hardly indicative of danger

to officers.  The Government relies heavily on the officers' testimony that they

saw Defendant Gulledge lean toward the Tahoe console immediately after the

officers put their lights on to pull the vehicle over.  This Court is somewhat

disturbed by the emphasis on this "lean," which could represent any number

of innocent behaviors.  The Government also relies heavily on Defendant

Gulledge's claimed nervousness, which could also relate to a number of

innocent causes.  Nevertheless, the law gives great deference to officers in the

line of duty, given the dangers of the job.  In a case such as this, where both

officers consistently testified that they were concerned about weapons and for

their safety, the law makes it difficult to second-guess their decision to

conduct protective searches.  Accordingly, this Court will not recommend that

evidence be suppressed as a result of the protective searches of Defendants

and the Tahoe.

**D.     Defendants' Statements**

A suspect must be informed of his constitutional rights to remain silent and to be represented by counsel prior to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 473 (1966).  The Government may not introduce statements from a custodial interrogation unless Miranda warnings were properly given.  See id. at 479.  Voluntary statements that are not the result of interrogation do not require Miranda warnings.  See id. at 478. Interrogation is generally defined as direct questioning or the functional equivalent.  See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

Defendants move to suppress their statements made to each other in the back of the squad car.  However, their voluntary statements to each other were not the result of police interrogation, and as such, the officers were not required to give them Miranda warnings.  On these grounds, this Court recommends that Defendants' motions to suppress statements be denied.

### III.    Defendant Brown's Motion for Severance

Defendant Brown moves to sever his case from Defendant Gulledge's, contending that he will be unfairly prejudiced by joinder.

Joinder is governed by Federal Rule of Criminal Procedure 8, and relief from improper joinder, severance, is governed by Rule 14.  An

indictment that names all of the defendants in a single conspiracy count is a

sufficient allegation to join defendants under Rule 8(b).  United States v.

O'Connell, 841 F.2d 1408, 1432 (8th Cir. 1988).  "In general, persons charged

in a conspiracy or jointly indicted on similar evidence from the same or related

events should be tried together."  United States v. Jones, 880 F.2d 55, 63 (8th

Cir. 1989) (quoting United States v. Adkins, 842 F.2d 210, 211 (8th Cir.

1988)).  The existence of antagonistic defenses are by themselves only a basis

for severance "when there is a danger that the jury will unjustifiably infer that

this conflict alone demonstrates that both are guilty."  United States v. Delpit,

94 F.3d 1134, 1143 (8th Cir. 1996) (quoting United States v. De Luna, 763

F.2d 897, 921 (8th Cir. 1985)).  A defendant may also show real prejudice in

his joinder by showing either that the "defense is irreconcilable with the co-

defendant's defense 'or that the jury will be unable to compartmentalize the

evidence as it relates to separate defendants.'"  United States v. Abfalter, 340

F.3d 646, 652 (8th Cir. 2003) (quoting United States v. Gutberlet, 939 F.2d

643, 645 (8th Cir. 1991)).  Defenses are considered "irreconcilable" when they

"so conflict that the jury, in order to believe the core of one defense, must

necessarily disbelieve the core of the other." <u>Id.</u> (quoting <u>Jones</u>, 880 F.2d at 63).

Severance is not favored.  A "court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent a jury from making a reliable judgment about guilt or innocence . . .." <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993).  "Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." <u>Id.</u> at 538-39.  "When joinder is proper under Rule 8, the defendant seeking a severance has the burden to demonstrate how the joint trial prejudiced his or her right to a fair trial." <u>United States v. Darden</u>, 70 F.3d 1507, 1527 (8th Cir. 1995) (citing <u>United States v. Penson</u>, 62 F.3d 242, 244 (8th Cir. 1995); <u>United States v. Lane</u>, 474 U.S. 438, 447 (1986)).  Lastly, "[a] joint trial gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." <u>United States v. Darden</u>, 70 F.3d 1507, 1528 (8th Cir. 1995).

In the present case, the Court cannot find a sufficient basis to sever the Defendants' cases.  The fact that Defendant Brown may be

prejudiced by the evidence against Defendant Gulledge does not, in itself,

justify severance.  The Government has charged a count of conspiracy to

distribute against the Defendants, and it is entitled to offer evidence of joint

activity.  The Government will likely offer similar evidence against the

Defendants.  Because Defendant Brown has not shown that his defense is

irreconcilably in conflict with Defendant Gulledge's, this Court finds that

severance would be inappropriate here.  This Court recommends that

Defendant Brown's severance motion be denied.


Based upon the foregoing, and all the files, records, and

proceedings herein, **IT IS HEREBY RECOMMENDED**:

(1)     Defendant Brown's Motion to Suppress Statements,

Admissions and Answers (Doc. No.35) should be **DENIED**;

(2)     Defendant Gulledge's Motion to Suppress Statements,

Admissions and Answers (Doc. No. 27) should be **DENIED**;

(3)      Defendant Brown's Motion to Suppress Evidence Obtained

as a Result of Search and Seizure (Doc. No. 40) should be **DENIED**;

(4)     Defendant Gulledge's Motion to Suppress Evidence Seized

(Doc. No. 29) should be **DENIED**;

(5)     Defendant Brown's Motion for Severance  (Doc. No. 33)

should be **DENIED.**

Dated: April 25, 2005

        s/Jonathan Lebedoff
JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties by May 9, 2005, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this rule shall be limited to ten pages.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.  Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.